## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

Greg Bakkestuen
David Winchell
Brian Jensen

     **Plaintiffs**

     **v.**                                    **Case No. 14-CV-700**

Lepke Holdings LLC
William Lepke Trucking LLC
William Lepke

     **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY

### I.     Introduction.

Plaintiffs were employed as dump truck drivers for the Defendants.  (PFOF ¶5)  During most work days the plaintiffs would pick up their dump truck at the company shop, drive the dump truck to a site where the truck will be loaded with materials, waited for their trucks to be loaded at the first loading site, made deliveries throughout the day, drive their dump trucks back to the company shop, and fuel the trucks. [1] (PFOF ¶7) Defendant Lepke Holdings only paid the plaintiffs for their drive time between when their trucks are loaded for the first time on the day, and when their trucks are unloaded for the final time on the day. (PFOF ¶12) The Plaintiffs

---

[1] Plaintiffs also contend that they performed morning and afternoon inspections on the trucks, and warmed up and built up air pressure on the trucks in the morning.  Because the Defendant disputes that the Plaintiffs performed these activities at all, Plaintiffs are not seeking summary judgment on liability for their time spent performing these activities.

therefore were not paid for their drive time from the shop to the first loading site for the day, their waiting time at the first loading site, their drive time from the final unloading site back to the shop, and their time fueling the trucks. (PFOF ¶7-9, 11) Discovery shows that while the amount of damages the Defendants owe to the Plaintiffs are sharply disputed, whether the plaintiffs are entitled to be paid for their drive time, waiting time, and fueling time under both the FLSA and Wisconsin law; as well as the appropriate methodology to use to calculate damages owed to the Plaintiffs can be decided as a matter of law.  Plaintiffs will use two separate workweeks for Plaintiff Bakkestuen, workweeks ending July 26 and September 27, 2013, to present these liability and damage methodology issues to the Court.  The Court's decision on liability will greatly simplify issues to be tried and/or facilitate productive settlement discussions.

The Plaintiffs' work of transporting their dump trucks, their main tool for their work, between the company shop and the loading/unloading sites constitute a part of their principal activities, and are compensable.  The Plaintiffs wait time at their first loading site, after driving from the shop to the loading site, is subject to the continuous workday rule.  Under that rule the Plaintiffs' waiting time is compensable because they had to wait near their trucks, and could not use the time effectively for their own purposes.  The Plaintiffs time spent fueling their trucks similarly is time spent in physical exertion required by their employer, and is compensable. Employees' time spent waiting to fuel, during which they cannot leave the fueling location, is compensable for the same reason that waiting time at the first loading site for the day is compensable.  Wisconsin law similarly requires for employees to receive pay for all time spent in physical or mental exertion required by the employer, requires compensation for work

performed while driving, and requires pay when employees cannot use waiting time effectively for their own purposes, such as when they are required to wait at the employer's premises.

Under the FLSA, Lepke was required to treat all hours spent by its drivers driving between the shop and the jobsite, waiting time, and fueling time as hours worked.  During Plaintiff Bakkestuen's first week of employment at Lepke, there were no interstate driving assignments, so that Bakkestuen was eligible for overtime pay that week under both the FLSA and Wisconsin law.  During the week ending September 27, 2013, Bakkestuen did have an interstate driving assignment, so that he was exempt from overtime pay under the FLSA. However, Lepke's contractual obligation to pay straight-time and overtime compensation to Bakkestuen for his driving time, waiting time, and fueling time during that week is fully enforceable under Wis. Stat. §109.03(1) and (5).  Nor are Wisconsin wage laws sufficiently related to the price, route, or service of motor carriers to warrant exemption under 49 U.S.C. §14501(c).

Nor can Lepke Holdings successfully argue to offset the amounts it owes to Bakkestuen, by other payments that it made to him.  The agreement between Lepke Holdings and Bakkestuen was to pay Bakkestuen whenever the truck was paid.  All of overpayments claimed by Lepke constitute time when the truck was paid by Lepke's customers, were contractually required, and therefore cannot be used to offset Lepke's statutory liability.  Moreover, any offset claimed by Lepke would be purely speculative, when it cannot pinpoint the days, let alone the hours, when the alleged overpayments occurred.

3

Plaintiffs are additionally entitled to summary judgment on Lepke's failure to compensate them for time attending training during regular working hours; and for failing to correctly compensate them for hours worked acknowledged on their check stubs.

## ARGUMENT

1.  <u>The Plaintiffs' Additional Hours Worked are Compensable</u>.

a.  <u>Plaintiffs' Time Spent Driving Their Dump Trucks is Compensable Under Both the FLSA and Wisconsin Law</u>.

The parties do not dispute that dump truck operated by the Plaintiffs constitute their most important tool needed to perform their day to day work for Lepke Holdings.  The Defendants admit paragraph 12 of the Second Amended Complaint, which alleges:

> The Plaintiffs could not successfully complete their work tasks for the Defendants without the vehicles owned by the Defendants since those vehicles were the only ones available to them, which had the necessary power and carrying capacity to complete their work assignments. The vehicles were thus the most important tool used by the Plaintiffs in their day to day work for the Defendants.

PFOF ¶17.  Plaintiffs may be required to pick up 20 tons of materials at one time.  It would not be possible to pick-up, or deliver the materials without using the dump trucks.  (PFOF ¶16)

An activity is integral and indispensable to the employee's principal activity, and therefore compensable under the FLSA, when it is an intrinsic portion or element of principal activities, and one which the employee cannot dispense of if he is to perform his principal activities. *Integrity Staffing Solutions v. Busk*, 135 S. Ct. 513, 517 (2014).  The Plaintiffs' work of driving their dump trucks to the first loading location for the day clearly meets this test:  The Plaintiffs could not pick up and deliver construction materials, their principal activity, unless they first deliver their dump trucks to the first loading site.  (PFOF ¶7, 16)  Driving the dump

4

trucks to the first loading site is also an intrinsic portion of the plaintiffs' work of driving between loading sites and dump-off sites throughout their workdays. *See also Burton v. Hillsborough County*, 181 Fed Appx. 829, 837-838 (11th Cir. 2006) (Work of picking up the vehicle, and driving to the first jobsite constitute principal activity, when the plaintiffs could not perform their principal activity without using the vehicles that they picked up and transported); *DA&S Oil Well Servicing Inc. v. Mitchell*, 262 F. 2d 552, 555 (10th Cir. 1958) (Employees' work of driving equipment, without which their well servicing work cannot be done, to the jobsite is an integral and indispensable part of their principal activity).

Similarly, when the employer requires the employee to keep a vehicle at its facility overnight, the employee's work of driving the vehicle from the jobsite back to the storage facility also constitute a part of the employee's compensable principal activities. *Burton*, 181 Fed. Appx. At 835; *Mitchell*, 262 F. 2d at 555. The result comports with the broader principle that all work suffered or permitted by the employer is work time; so that when the employer required its employee to drive a truck back to the company shop for storage, the employee should be paid for his drive time required by his employer. See 29 C.F.R. §785.11, §785.38 (If employee finishes working at 8 p.m., and is required to return to the employer's premises at 9 a.m., all of that time (between 8 p.m. and 9 p.m.) is work time). When Lepke required the Plaintiffs to drive their trucks back to the company shop for overnight storage, the Plaintiffs drive time as required by Lepke is compensable work time under the FLSA. (PFOF ¶20, 21)

The same result would follow even if the Plaintiffs did store their dump trucks at home overnight. Home to work travel is compensable, if done using a vehicle that requires a license to operate; and is substantially more difficult to drive than a passenger car. *Collella v. City of New*

5

*York*, 986 F. Supp. 2d 320, 341 (S.D. N.Y. 2013); 2001 DOLWH Lexis 6.  A commercial driver's license is required to operate the dump trucks.  (PFOF ¶22) Driving a dump truck is also substantially more difficult than driving a passenger car in that the dump trucks have longer stopping distances, must turn much slower, cannot be operated with drastic movements, have more blind spots, and require more mirrors; so that it is more difficult to operate, and require more training, than a passenger vehicle.  (PFOF ¶23)

The Plaintiffs' drive time is even more clearly compensable under Wisconsin law.  Under Wisconsin law, employees must be paid for all time spent in physical or mental exertion (whether burdensome or not) controlled or required by the employer, and pursued necessarily or primarily for the employer's benefit.  DWD §272.12(1)(a)1.  When an employee is working while traveling by driving a truck, his travel time must be paid.  DWD §272.12(2)(g)8. The employee's travel time similarly must be paid, when he is required to first arrive at a meeting place to pick-up tools. DWD §272.12(2)(g)5.  The Plaintiffs' actual work of delivering their dump trucks from the company shop to the first loading site for the day, and from the final unloading site for the day back to the company shop, is therefore work time under Wisconsin law when required by their employer.  The conclusion is further strengthened by the fact that the plaintiffs are transporting their primary tool for completing their job responsibilities for Lepke, their dump trucks.

        b.    <u>All of the Plaintiffs' Waiting Time at the First Loading Site are Hours Worked</u>.

Under the continuous workday rule, all of the employee's time spent after performing his first principal activity for the day, and before completing his final principal activity for the day, constitutes his workday.  Within that workday the Portal to Portal Act, 29 U.S.C. §254, which

6

excludes from compensation preliminary and postliminary activities, has no application. *IBP Inc. v. Alvarez*, 546 U.S. 21, 29 (2005). Therefore, when the plaintiffs' taking off of their gear is a principal activity, the compensability of time spent while waiting to taking off the gear is governed by the FLSA, rather than by the Portal to Portal Act. *See* 546 U.S. at 40.

Similarly, on July 23, 2013, the first principal activity performed by Bakkestuen was driving his dump truck from the company shop in Westby, Wisconsin to the loading site in Boscobel, Wisconsin. (PFOF ¶7, 24) He then had to wait at the jobsite to be loaded. (PFOF ¶8) The compensability of Bakkestuen's waiting time on July 23, 2013 was therefore governed by the FLSA, not the Portal to Portal Act. The Court need not decide, for summary judgment on liability, whether the portal to portal act applied to Bakkestuen's waiting time at the first loading site during the following three days, when his truck was stored at Boscobel overnight.

Prior to the passage of the Portal to Portal Act, the Supreme Court had held that under the FLSA, time spent on the employer's premises while waiting for work is compensable, even though the employee spent the time in idleness, or playing cards. *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944). *See also Jonites v. Exelon Corp.*, 522 F. 3d 721, 723 (7th Cir. 2008) (Employee waiting time while on call is compensable when the employee must remain at, or is so close to the employer's premises, that he cannot use the time effectively for his own purposes). Several district courts have indeed interpreted *Alvarez* to mean that the employees' waiting time during the continuous workday, while they remain on the employer's premises, are always compensable. *Helmert v. Butterball*, 805 F. Supp. 2d 655, 677 (E.D. Ark. 2011); *Arnold v. Schreiber Foods*, 690 F. Supp. 2d 672, 683 (M.D. Ten. 2010) (Assuming donning and doffing time compensable, waiting and walking time after donning, and before doffing compensable). If

the employer does not want to pay for excessive waiting time during the continuous workday, it must promulgate and enforce a policy against idle waiting time. *Helmert*, 805 F. Supp. 2d 677.

Similarly, while waiting to be loaded the Plaintiffs may be required by Lepke's customer to remain in the cabs of their trucks. (PFOF ¶25). Even when the Plaintiffs were permitted to leave their trucks, they could not walk away from the proximity of their trucks because they were responsible for the safety of their trucks, because it was not safe to walk around in a quarry, and because they had to be near their truck radios in case there was a change to the load time. (PFOF ¶26) Because the Plaintiffs must stay near their trucks, they could not use their waiting time effectively for their own purposes, in the same way that a factory worker sitting in a factory cannot use his wait time effectively for his own purposes. All of the Plaintiffs' waiting time at the first loading site, as a part of their continuous workday, is therefore compensable.

The Wisconsin regulations similarly define the work day as the period between the time when the employee commences his principal activities, and the time when the employee ceases performing his principal activities. DWD §272.12(1)(a)2. By definition, the Plaintiffs' waiting time during their continuous workday cannot constitute preparatory or concluding activities within the meaning of DWD §272.12(2)(e). Waiting time is compensable when the employees cannot use the time effectively for their own purposes, or are not completely relieved from duty while waiting. DWD §272.12(2)(b)2-4. In this case, the Plaintiffs must remain near the trucks, safeguard the trucks, and monitor their radios, so that they are neither completely relieved from duty, nor could use their waiting time effectively for their own ends.

The Plaintiffs' wait time is therefore hours worked under Wisconsin law. If Lepke believes the plaintiffs' waiting time is excessive, it must exercise its control to make sure

8

unwanted work is not performed.  DWD §272.12(2)(a)3.  It has never promulgated nor enforced a rule prohibiting its drivers from arriving at the loading site too early.  (PFOF ¶27)

      c.      <ins>All of the Plaintiffs' Time Spent Fueling, and Waiting to Fuel Their Trucks Constitute Work Time</ins>.

Pursuant to Lepke Holdings' policy, trucks must be completely filled with diesel fuel at the end of the day.  (PFOF ¶28)  In practice, drivers may stop at a gas station a couple of miles from the shop to fuel on their final return trip from the final dump-off site to the shop.  (PFOF ¶11)  Since fueling the dump trucks is required by Lepke Holdings, and is done primarily for the benefit of Lepke Holdings, all of the plaintiffs' time spent fueling their trucks is compensable under both the FLSA and Wisconsin law.  *Tennessee Coal Co. v. Muscoda Local*, 321 U.S. 590, 598 (1944); DWD §272.12(1)(a).

Moreover, since fueling the truck is a principal activity, and the plaintiffs wait to fuel prior to performing that principal activity, the compensability of the Plaintiffs' time waiting to fuel is governed by the FLSA, not the Portal to Portal Act.  While waiting to fuel the Plaintiffs must remain at the company shop or gas station; and remained responsible for the security of their trucks.  Waiting time while waiting to fuel is therefore compensable, for the same reasons that waiting time at the first loading location for the day is compensable.

      2.      <ins>For the Week Ending July 26, 2013, Lepke is Liable to Bakkestuen under the FLSA</ins>.

      a.      <ins>The Interstate Driving Exemption is not Applicable</ins>.

Pursuant to the motor carrier exemption, employees who are subject to the Secretary of the Department of Transportation's jurisdiction are exempt from the FLSA's maximum hour and overtime provisions.  *Johnson v. Hix Wrecker Serv.*, 651 F. 3d 658, 660-661 (7th Cir. 2011)

9

Establishing the exemption for a driver requires a showing that the carrier has engaged in interstate commerce, and that during the preceding 4 months the driver could reasonably have been expected to make one of the interstate runs.  Id. at. 661.  The exemption does not apply if the possibility that the employee would be sent on an interstate assignment is remote. Id. at 663.

The week ending July 26, 2013 was Bakkestuen's first week of employment at Lepke Holdings.  (PFOF ¶5)   Neither Bakkestuen, nor any other Lepke driver, had an interstate driving assignment during the week.  (PFOF ¶18)   Nor are the Defendants aware of any instances in which one of its drivers made a trip entirety within the state of Wisconsin; but the material delivered ultimately originated from, or ended up outside the State of Wisconsin. (PFOF ¶29) Bakkestuen therefore did not have; and could not have been assigned to drive an interstate route during his first week of employment at Lepke Holdings.  He was not exempt from the FLSA's maximum hour and overtime requirements during that week.

b.    Lepke Holdings Cannot Rely on Bakkestuen's Time Card to Escape Liability.

Nor can Lepke Holdings claim an exemption, because Bakkestuen did not record his driving time, waiting time, and fueling time on his time card.  Bakkestuen's time card for the week ending July 26, 2013 had the columns "time out" and "time in," with time out meaning the time when the trucks are loaded for the first time on the day, and time in meaning when the trucks are unloaded for the final time on the day.  (PFOF ¶31, 32)  Similarly, Bakkestuen's time card for the week ending September 27, 2013 had the columns "start AM", meaning when the truck was loaded for the first time on the day; and "stop PM, meaning when the trucks are unloaded for the final time on the day.  (PFOF ¶34, 35)  Bakkestuen did not write his driving time, waiting time, and fueling time on his time cards, precisely because Lepke told him that he

would only be paid when his truck was paid by Lepke's clients; and Lepke's trucks were not paid before the first load, and after the final unload.  (PFOF ¶36)

The burden of keeping accurate records of the employee's hours worked is on the employer.  When the employer failed to keep accurate time records, the employer rather than the employee should suffer the consequences.  *Walton v. United Consumer Club*, 786 F. 2d 303, 314-315 (7th Cir. 1986).  When the employer instructed the employee to not record hours worked on their time cards, it cannot then rely on the employee's failure to report his hours worked (as instructed) as a defense.  *Skelton v. Am. Intercontinental Univ. Online*, 2005 U.S. Dist. Lexis 49091 *10 n. 1 (N.D. IL. 2005).  Similarly, having instructed Bakkestuen to only record on his time card hours worked between his first loading and his final unloading, Lepke Holdings cannot rely on Bakkestuen's compliance with its unlawful instructions as a defense.

    c.    <u>Lepke Holdings Cannot Claim an Offset for Bakkestuen's Break and Unworked time</u>.

Lepke Holdings claims three different types of offsets for the unpaid hours that it owes to Bakkestuen:  Time spent during breaks, time written on the plaintiffs' time cards for a return trip when the plaintiffs worked for Mathy Construction, and time claimed on the plaintiffs time cards after their final delivery, which they did not work.  (See Second Amended Answer, ¶¶72-74)  Bakkestuen did not work for Mathy during the week ending July 26, 2013, so that the return trip offset is not an issue during this week.  (PROF ¶37)

When an employer fails to pay his employees for some of their hours worked, it cannot use other agreed upon compensation, which it did not have to pay by law, to offset those unpaid hours worked.  *Ballaris v. Wakcer Sitronic Corp*., 370 F. 3d 901, 914 (9th Cir. 2004) (Where the employer agreed to pay employees for their lunch periods, it cannot use the lunch period

compensation to offset the employees' unpaid hours changing into, and out of required uniforms). The employer cannot use time that the employee did not work, but was paid for to offset its liability, even when the employee may be subject to discipline for not working. *Kasten v. St. Gobain Performance Plastics Corp*., 556 F. Supp. 2d 941, 953 (W.D. WI. 2008) (When the employees extended their breaks, and were paid for the extended minutes, those extended minutes cannot be offset from other unpaid time worked by the employees; even though the employees were subject to discipline for extending their breaks) (Following *Ballaris*). *See also Crawford v. Coran Fire Dist.*, 2015 U.S. Dist. Lexis 57997 (E.D. N.Y. 2015) (Employees entitled to pay additional overtime pay, even though during every two pay periods they were paid for one 24 hour period that they did not work).

In this case, there was a contractual agreement between Lepke Holdings and its drivers to pay the drivers for all hours that the trucks are paid. At his deposition, Lepke Holdings Owner William Lepke testified that: "When I hired all my guys, I told them, you get paid when the truck gets paid." (PFOF ¶39) Bakkestuen similarly confirms that when he was hired, he was told that he would be paid, when Lepke's truck was paid by its customers. (PFOF ¶36) An agreement is formed when the employer promises the employee employment under stated terms, and the employer promised to continue employment under those terms. *Ferrero v. Koelsch*, 124 Wis. 2d 154, 164 (1985). The employee's continued work for the employer furnishes adequate consideration for the employer's promise of wages or fringe benefits. *Ferrero*, 124 Wis. 2d at 168 n. 5. Similarly, when Bakkestuen agreed to, and subsequently performed work for Lepke Holdings, an agreement was formed between Lepke Holdings and Bakkestuen to pay Bakkestuen for all hours that his truck was paid by Lepke Holdings' customers. Nor was there any

reservation of right by Lepke to exclude Bakkestuen's paid time from his hours worked. *Contrast Barefield v. Village of Winnetka*, 81 F. 3d 704, 711 (7th Cir. 1996) (Employer explicitly reserved right to not count the employees' paid 30 minute meal periods towards hours worked, by stating in the manual that overtime pay is only triggered, when the employees exceeded their scheduled work hours by 30 minutes or more).

Lepke Holdings charges its customers by the hour for its services; so that it was paid for all of the hours shown on the Plaintiffs' time cards as hours worked. (PFOF ¶42)   Even if the Plaintiffs did pad their hours worked by claiming pay for break time and other hours that they did not work, a charge that the Plaintiffs vigorously dispute, they claimed those hours worked on their time cards, so that Lepke was paid for those hours by its customers.   Plaintiffs thus had a contractual right to be paid for all hours paid by Lepke's customers, including the alleged padded hours.  These allegedly padded hours therefore cannot be offset from the Plaintiffs' unpaid hours worked, in the same way that the minutes of the plaintiffs' extended breaks cannot be offset from their unpaid hours worked in *Kasten*.

Lepke Holdings' claims on break time also fails on the merits.  Rest periods of between 5 and about 20 minutes in duration must be paid. *Kasten*, 556 F. Supp. 2d at 953, 29 C.F.R. §785.18.   Coffee breaks and time for snacks are explicitly recognized as compensable rest periods by 29 C.F.R. §785.19(a).  Only a bona fide meal period, during which the employee is completely relieved from duty for the purpose of eating a meal, can be excluded from compensation.  See Id. In the case at bar, Bakkestuen may sometimes stop for a comfort break or pick up a sandwich at a gas station during his workday, but would not eat at the gas station unless he was simultaneously waiting to fuel; and would not spend 15 minutes or longer at the

gas station not counting time spent fueling or waiting to fuel.  (PFOF ¶43)  He instead would normally eat while driving for Lepke Holdings.  (PFOF ¶44)  Bakkestuen therefore never had a break of at least 15 minutes, during in which he was completely relieved from duty for the purpose of eating a meal.  Bakkestuen's breaks are thus compensable under the FLSA.

Lepke Holdings' claim for an offset also faces a fundamental evidentiary problem:  It cannot prove the dates or times when the Plaintiffs padded their hours worked.  William Lepke admitted that he did not know how long the Plaintiffs's stops at the gas stations were; nor can he identify any specific dates when the plaintiffs ate while parked at a gas station.  (PFOF ¶45)  Lepke additionally testified that he had no way to determine on which dates the Plaintiffs padded their hours. (PFOF ¶47)  Lepke similarly failed to identify a single instance where a plaintiff took a meal period or break, during which he was completely relieved from duty for at least 20 minutes (PFOF ¶46)  Simply put, Lepke cannot pinpoint the dates and amounts that he alleges the plaintiffs padded their time.

While the FLSA Recognizes that employees may face a lower burden to prove damages, when the employer failed to maintain adequate records, *see Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946), no similar reduced burden of proof has ever been recognized for the employer's claim of an offset.  Lepke Holdings' claim of an offset is therefore subject to the general rule that precludes the recovery of uncertain and speculative damages.  *Brown v. Family Dollar Stores of Ind.*, 534 f. 3d 593, 596 (7th Cir. 2008)  Lepke Holdings is not entitled to an offset from the hours that it failed to pay to the Plaintiffs, when it cannot identify the date or amount by which the Plaintiffs padded their hours worked, even assuming arguendo such an offset is appropriate (which it is not, as argued above).

14

        d.      <u>Bakkestuen is Entitled to Additional Overtime Pay Under the FLSA</u>.

During the week ending July 26, 2013, Bakkestuen was paid by Lepke Holdings for 42.75 hours worked.  (PFOF ¶51)  Pursuant to Lepke policy that drivers only record work time between when they are loaded for the first time on the day, and unloaded for the final time on the day, the 42.75 hours did not include time spent by Bakkestuen driving from the company shop to the first loading site, waiting at the first loading site, driving from the final dump-off site to the company shop, or fueling his truck.  During the week it took Bakkestuen at least 30 minutes on July 23, 2013 to drive from the Westby shop to the first loading site, and at least another 30 minutes on July 26, 2013 to drive from the final dump-off site to the Westby shop.  (PFOF ¶49)

As a matter of arithmetic, any increase in Bakkestuen's hours worked would also result in an increase in his overtime premium pay.  For example, even if Bakkestuen is only credited with one additional hour worked, so that he worked a total of 43.75 hours during the week ending July 26, 2013, his total of $598.50 in straight time pay ($617.75 in total pay minus overtime premium of $7 per hour for 2.75 hours) should be divided by 43.75 hours, resulting in average straight time pay of $13.68.  Overtime premium for the week therefore should equal ½ of $13.68 multiplied by 3.75 hours of overtime, for a total of $25.65.  Bakkestuen's total compensation for the week therefore should be $624.15 (598.50 + $25.65); or $6.50 higher than the $617.75 he actually received from Lepke. (PFOF ¶51-54) Lepke is liable to Bakkestuen under the FLSA.

        3.      <u>For Both the Weeks Ending July 26, 2013 and September 27, 2013 Bakkestuen was Entitled to Both Additional Straight-Time and Overtime Pay Under Wisconsin Law.</u>

        a.      <u>Wisconsin Wage Laws Are not Preempted by 49 U.S.C. §14501(c)</u>.

49 U.S.C. §14501(c) prohibits states from promulgating laws that had the force or effect of a law related the price, route, or service of motor carriers with respect to the transportation of property. The law does not, however, apply to state wage and hour laws that may indirectly affect the prices charged by motor carriers.  As the Ninth Circuit noted in *Californians for Safe and Competitive Dump Truck Transp. v. Mendonca*, 152 F. 3d 1184, 1187 n. 3 (9th Cir. 1998), when addressing a claim that California's prevailing wage laws were preempted by §14501(c), Congress did not recognize prevailing wages laws as regulation of the price, route, or service of motor carriers.  The Ninth Circuit went on to hold that the effect of prevailing wage laws on the carrier's price, route, or service was indirect, remote, and tenuous, so that the prevailing wage law was not related to the price, route, or service of motor carriers, and was not preempted by §14501(c).  *See* 152 F. 3d at 1189. In *S.C. Johnson & Sons v. Transp. Corp. of Am. Inc*., 697 F. 3d 544, 558 (7th Cir. 2012), the Seventh Circuit cited *Mendonca* with approval; and noted that no one thinks §14501(c) preempts labor laws, such as minimum wage laws, even though changes to those laws could ultimately affect the prices or service of motor carriers.

Similarly, in *Costello v. Beavex Inc*., 303 F.R.D. 295, 303 (N.D. IL. 2014), the court made a distinction between laws that directly regulates the prices, route, or service of a carrier, and "background" laws that applies to the relationship between employers and employees in general, do not target motor carriers, and affect motor carriers only as members of the public. The court held that Illinois' wage laws were "background" laws that do not directly target, and do not relate to the price, route, or services of motor carriers, and therefore are not preempted by §14501(c).  Similarly, Wisconsin wage and hour laws apply to, and regulate the relationship between all Wisconsin employers and their employees; and affect motor carriers only as

16

members of the public.  Exempting motor carriers from Wisconsin wage and hour laws under §14501(c) would exempt motor carriers from all general state regulation that could indirectly affect the prices and services of carriers; and go far beyond the preemptive force of §14501(c).

      b.     <u>Lepke Holdings Owes Bakkestuen Straight Time Pay At his Regular Rate</u>.

Wisconsin law defines wages in as remuneration payable to an employee for personal services, including any similar advantages (to salaries) agreed upon between the employer and the employee or provided by the employer to the employee as an established policy.  Wis. Stat. §109.01(3).  Wages under Wisconsin law therefore means all compensation the employer agreed to pay to the employee, rather than only the minimum level of compensation required by law.  The employer has a statutory obligation to pay to its employees the full amount of wages during each pay period.  Wis. Stat. §109.03(1) and (5).  *See also Hubbard v. Messer*, 2003 WI 15 ¶8; 259 Wis. 2d 654 (Ct. App. 29002) (Chapter 109 concerns the employee's right to receive the full amount of wages due); *Jacobson v. American Tool Cos*., 222 Wis. 2d 384, 401 (Ct. App. 1998) (Former company president would not receive the full amount of stock redemption wages, if he had to use some of those recovered wages to pay his attorneys fees).

Before Bakkestuen worked a single day for Lepke Holdings, he was told by Lepke Holdings that he would receive $14 per hour for each and every hour he worked.  (PFOF ¶55)  Bakkestuen accepted, and furnished consideration for the promise to pay him $14 per hour, by commencing and continuing to perform work for Lepke Holdings.  (PFOF ¶56)  *Ferrero*, 124 Wis. 2d at 164, 168 n. 5.  Wis. Stat. §109.03(1) and (5) therefore required Lepke Holdings to pay to Bakkestuen the agreed upon rate of $14 per hour for each and every hour he worked.  Lepke Holdings had the same understanding of its contractual (and therefore §109.03(1) and (5))

17

obligation:  Each employee has a regular rate for non-prevailing wage work, will receive that rate for every hour worked other than prevailing wage work, so that Lepke would not justify non-payment of an employee's hours worked by claiming that the employee on average still received the minimum wage. (PFOF ¶57-59)  Such a contractual obligation to pay full wages is fully enforceable through Wis. Stat. §109.03(1) and (5), which requires the employer to pay to its employees the full amount of owed wages during each pay period.

Under Wisconsin law, Bakkestuen was entitled to the full promised $14 per hour (or higher for prevailing wage projects), rather than the minimum wage, for each of his hours worked that was paid by Lepke Holdings.  Unlike the minimum wage FLSA, Lepke cannot count the portion of the wages paid to Bakkestuen that exceed the minimum wage as compensation for other hours Bakkestuen worked that it failed to pay.  Bakkestuen therefore was paid at the rate of $0 per hour for his time driving from the shop to the first loading site, waiting to be loaded at the first jobsite, driving from his final unloading site to the shop, and fueling his truck.

In Bakkestuen's case, DWD §272.03 prohibits employment at a hourly rate lower than $7.25 per hour.  The regulation is very similarly worded to 29 U.S.C. §206(a)(1), which requires employment of employees at a minimum rate per hour.  The FLSA has been interpreted to require the payment of the minimum wage to employees for each and every hour they are employed.  *DeKeyser v. Thyseenkrupp Waupaca Inc*., 735 F. 3d 568, 571 (7th Cir. 2013); *Espenchied v. Directsat USA*, 705 F. 3d 770, 773 (7th Cir. 2013).  Similarly, DWD §272.03 requires payment of at least $7.25 per hour for each and every hour Bakkestuen worked for Lepke Holdings.  Any "agreement" by Bakkestuen to accept a wage rate of $0 for his compensable work before his truck is loaded for the first time, and after his truck is unloaded for

the final time on the day is null and void. *Spoerle v. Kraft Foods Global*, 614 F. 3d 427, 430 (7th Cir. 2010) (Wisconsin law requires that the parties' agreement be ignored, to the extent it provides for wages lower than the minimums required by law).

The invalidation of the unlawful agreement to pay Bakkestuen at the rate of $0 for his driving, waiting, and fueling time creates a gap in his employment contract on the applicable rate for such work.  Under Wisconsin law, such gaps in the contract should be filled by relying upon other portions of the contract, parole evidence, or other default gap-fillers, such as evidence of the intent of the parties.  *Kuehn v. Safeco Ins. Co*., 140 Wis. 2d 620, 626 (Ct. App. 1987), *followed by N. Crossarm Co. v. Chem. Specialities Inc*., 318 F. Supp. 2d 752, 759 (W.D. WI. 2004).  More generally, courts should look at how similar work is paid, when filling the gap in a contract on the pay rate for work that the employer was legally required to, but failed to pay. *Lemon v. Shawnzee*, 972 F. 2d 1145, 1155 (10th Cir. 1992) (Compensable meal breaks should be paid at regular rate rather than minimum wage, when employee received regular rate for all other hours worked); *Hawkins v. Securitas Sec. Servs. USA, Inc*., 2011 U.S. Dist. Lexis 125161 *20 (N.D. IL. 2011) (Court should consult CBA to determine rate for work during training, pre and post-shift, and cleaning uniforms when resolving Illinois law claim that the employer unlawfully treated the hours as unpaid).  Similarly, when Bakkestuen is paid at the rate of $14 per hour for his work driving between jobsites, waiting to be loaded, and fueling during the workday (PFOF ¶60); the same $14 hourly rate should apply to similar work performed by Bakkestuen at the beginning and end of his workday.

Nor can Lepke successfully claim an offset for the return trips that Bakkestuen was paid for, when he worked on a Mathy Construction Project on September 21 and 23, 2013.  By Mathy

policy, when a driver finishes his day at his final unloading site for the day, he should write down on his time card the amount of time it takes to drive back to his loading site for the day.  In fact, the employee would drive to the Lepke shop, rather than the loading site, after being unloaded for the final time on the day.  (PFOF ¶33)  The amount of drive time on the return trip bears no relationship to the actual drive time from the final unloading site to the shop.  (PFOF ¶61)  Once the return trip is recorded on employee time cards, Lepke Holdings gets paid by its customer for the time of the return trip.  (PFOF ¶62)  Lepke would lose money, if drivers failed to record the return trip on their time cards while working for Mathy. (PFOF ¶63)

Since Bakkestuen gets paid for the return trip regardless of what he did after he is unloaded for the final time on a Mathy project, the return trip is additional compensation for hours of work that Bakkestuen performed for Mathy, rather than compensation for Bakkestuen's drive time, waiting time, and fueling time. This is why the Plaintiffs can write down a 90 minute return trip, when it may only take 30 minutes to drive from the final unloading site to the Lepke shop. (PFOF ¶61)

Under Wisconsin law, Bakkestuen was entitled to be paid in full for his hours spent working for Mathy, including the additional compensation represented by the return time.  Wis. Stat. §109.03(1) and (5).   Under a full wage payment statute such as §109.03, Lepke cannot count some of this compensation as pay for other hours that it failed to pay.  Take the example of September 21, 2013, where Bakkestuen worked on a Mathy job between 7:00 a.m. and 11:45 a.m., and then wrote in a return trip equal to an additional half hour, the return trip is additional compensation for the work that Bakkestuen performed between 7:00 a.m. and 11:45 a.m., which Lepke is required to pay to Bakkestuen pursuant to Wis. Stat. §109.03(1) and (5). (PFOF ¶38)

20

Lepke cannot count the return trip compensation, which it was required to pay in return for Bakkestuen's work between 7:00 a.m. and 11:45 a.m. on September 21, 2013, as compensation for other work Bakkestuen performed outside those hours.  See also Ballaris, 370 F. 3d at 914.

Bakkestuen is therefore entitled to compensation of $14 per hour for each of his hours worked before his truck is loaded for the first time on the day, and after his truck is unloaded for the final time on the day.  These hours would include Bakkestuen's first drive from the shop to the first loading site, his waiting time at the first loading site, his drive time from the final unloading site to the shop, and his fueling his truck either at the shop, or at a gas station several miles from the shop. (PFOF ¶7-9, 11)

     c.    <u>Bakkestuen is Entitled to Overtime Pay, Even During Weeks When He Would be Exempt by Law From Receiving Overtime Pay</u>.

Wisconsin law has a similar interstate driving exemption to the FLSA.  DWD §274.04(4) The exemption did not apply to Bakkestuen's first week of employment at Lepke, the week ending July 26, 2013, since he could not be sent on any interstate driving assignments during that week.  Once Bakkestuen is given credit for his hours spent driving, waiting, and fueling at the beginning or/end of his workdays, his hours worked for the week, and therefore overtime pay will increase.  Bakkestuen is therefore owed additional overtime pay under Wisconsin law for the week ending July 26, 2013, in the same way he is owed overtime pay under the FLSA.

Bakkestuen's first interstate driving assignment was September 23, 2013.  (PFOF ¶19) Bakkestuen therefore was not eligible for statutory overtime pay for the week ending September 27, 2013.  During that week Bakkestuen was credited by Lepke as having worked 52.75 hours, not counting his driving time, waiting time, and fueling time at the beginning and end of his workdays.  (PFOF ¶15)

21

When the Plaintiffs were interviewed by Lepke, they were told that they would receive overtime pay whenever they worked over 40 hours per week. (PFOF ¶39) The Plainiffs in fact received overtime pay for working over 40 hours per week regardless of whether they had an interstate driving assignment.  (PFOF ¶41) For example, Bakkestuen received overtime pay at a total rate of $21 per hour on 12.75 hours worked during the week ending September 27, 2013, despite his interstate driving assignment on September 23, 2013. (PFOF ¶15)  By continuing to work for Lepke, the Plaintiffs accepted its proposal to pay them overtime pay for working over 40 hours during the week, even during weeks when they are legally exempt from overtime pay.

A contractual promise to pay overtime pay to an exempt driver is enforceable.  *Molina v. First Line Solutions Inc.*, 566 f. Supp. 2d 770, 778-779 (N.D. IL. 2007) (Recognizing viable contract claim for overtime pay under Illinois wage law, but not under the FLSA).  *See more generally Rutlin v. Prime Succession*, 220 F. 3d 737, 744 (6th Cir. 2000) (Parties are free to enter into contract to pay overtime pay to exempt employees).

Similarly, Lepke's promise to pay the plaintiffs overtime pay for working over 40 hours per week, even though they are exempt from statutory overtime, is enforceable under Wisconsin law.  Wisconsin law, unlike the FLSA, permits the enforcement of promises to pay wages far exceeding the minimums required by law. *Lynch v. Crossroads Counseling*, 2004 WI App 114 ¶11-12, 275 Wis. 2d 171 (Ct. App. 2004) (Enforcing promise to pay employee $30 per hour for compcare patients, rather than the $15 per hour he received); *Jacobson*, 222 Wis. 2d 384 (Former company President entitled to enforcement of his stock redemption rights).

Nor can Lepke successfully argue that the plaintiffs' pre-load, and post-unload hours should be excluded from the calculation of 40 hours required for overtime pay.  As argued

above, to the extent Lepke and Bakkestuen had an agreement to treat these hours as unpaid, such an agreement is unlawful and unenforceable.  Spoerle, 614 F. 3d at 430.  Nor can the agreement be reformed so that the Plaintiffs receive straight time pay for their pre-load and post-unload hours worked, but do not have those hours count towards contractual overtime.   Under Wisconsin law, reforming a contract requires either a mutual mistake, or a mistake by one party and fraud by the other.  *St Norbert College Foundation v. McCormick*, 81 Wis. 2d 423, 432 (1978).   Lepke's unilateral mistake of law, in not knowing that the pre-load and after unload hours must count as hours worked, does not provide a basis for reforming the parties' agreement.

Nor can Lepke escape its contractual obligation, by claiming that it promised overtime pay to the Plaintiffs by mistake.  Any mistake would result from Lepke not knowing of the interstate driving exemption, and constitute a mistake of law. (PFOF ¶64) Absent a mutual mistake of fact, a mistake of law does not relief a party of its contractual obligations.  *Sorce v. Rinehart*, 69 Wis. 2nd 631, 638 (1975); *Farmers Auto Ins. Ass'n v. Union Pac. Ry*., 2008 WI App 116 ¶13; 313 Wis. 2d 93 (2008), enforced by 2009 WI 73. (Party cannot withdraw from an agreement, because its ignorance of case law affected its decision to enter into the contract).

Bakkestuen was therefore entitled to overtime pay during the week ending September 27, 2013, even though he was covered by the interstate driving exemption during that week. Counting Bakkestuen's driving, waiting, and fueling time would clearly increase his overtime compensation for the week.

4.   <u>Lepke Owes Pay to the Plaintiffs for Attending Training</u>.

All three plaintiffs attended training on Thursday, February 20, 2014, during the hours of 7:30 a.m. and 1:30 p.m., which were the hours during which they normally would be working for

Lepke.  (PFOF ¶65)  Since none of the plaintiffs would have worked over 40 hours that week, even when counting the training hours, the Plaintiffs are bringing their training pay claim under Wisconsin law only.

Whether training is compensable under Wisconsin law is governed by DWD §272.12(f), which provides that training is compensable unless attendance is outside regular working hours, attendance is voluntary, the course is not directly related to the employee's job responsibilities, and the employee did not perform work while attending training.  There is no factual dispute that the first and third elements are not satisfied.  With respect to the first element, the training occurred between 7:30 a.m. and 1:30 p.m., during hours when the Plaintiffs normally would be working.  (PFOF ¶65)  With respect to the third element, the training concerned what things to look out for while working in a quarry. (PFOF ¶66) Since the Plaintiffs worked to pick up materials from quarries during most of their workdays, the training is directly related to the Plaintiffs' performance of their existing job responsibilities in a safe manner.  (Id.)

Under Wisconsin law, the Plaintiffs have received a pay rate of $0 for their time attending compensable training, in violation of Wisconsin's minimum wage law.  The Court should fill the gap in the contract by writing in the Plaintiffs' regular wage rate as the Plaintiffs' wage rate for attending training when the Plaintiffs received at least their regular hour rate, and not the minimum wage, for each and every hour that they worked for Lepke. (PFOF ¶57-59)

5.   <u>Lepke Owes Additional Overtime Pay to the Plaintiffs By Issuing Correction Pay to the Plaintiffs Without Checking whether the Correction Pay Would Result in Additional Overtime Compensation</u>.

Lepke depends on its customers for information on whether work should be paid at the prevailing wage. (PFOF ¶67)  When Lepke realizes that it has paid prevailing wage work at a

24

lower non-prevailing wage rate, it would issue a correction check to the Plaintiffs. (PFOF ¶68)

When issuing a correction check Lepke would not go back and look at the Plaintiffs' check stub

for the week, during which the work for which the correction pay is being issued was being

performed. (PFOF ¶69)  Lepke thus never determined whether the correction pay issued to the

Plaintiffs would have resulted in additional overtime compensation to the Plaintiffs.  From the

check stubs it is impossible to determine the weeks when the work was performed, for which the

"adjustment of state" was paid. (PFOF ¶70) Nor could Lepke make such a determination at its

deposition, even though the meaning and interpretation of check stubs and time records was one

of the topics for the deposition.  (PFOF ¶71, 72)

   As the United States Supreme Court held long ago in *Anderson v. Mt. Clemens*, 328 U.S.

680, 687 (1946), when an employer failed to maintain adequate and accurate records, the

solution is not to penalize the employee by denying him a recovery altogether. Rather, the

employee meets his burden if he can produce sufficient evidence to show the extent and amount

of work as a matter of just and fair inference.  Id. at 688.  DWD §272.11 requires employers to

keep track of their employees' rate of pay and wages paid each payroll period.  In other words,

when Lepke issues correction pay to the Plaintiffs, it was required to update its records to correct

both the rate of pay, and total compensation for the week for which the correction check was

issued.  Had it done so, calculations on the overtime pay impact of the correction can be easily

done.  Instead, it is now impossible to accurately determine, based on Lepke's payroll records,

the workweeks for which the correction checks were issued.

   When reconstructing the Plaintiffs' work weeks with exactitude is not possible, damages

can be calculated based upon the Plaintiffs' likely average workweek.  *Martin v. Selker Bros.*

25

*Inc.*, 949 F. 2d 1286, 1298 (3rd Cir. 1991) (Calculate average hours worked per week based on gallons of gasoline handled each week); *Baden-Winterwood v. Life Time Fitness*, 729 F. Supp. 2d 965, 999-1000 (S.D. OH. 2010) (Calculate damages owed to non-testifying plaintiffs based on average work week for testifying plaintiff). Similarly, records are available showing the total number of hours, and total straight time pay received by the Plaintiffs during every week of employment prior to the correction. (PFOF ¶73)  Overtime impact of the corrections can be estimated by calculating the average hours worked and average straight time pay received by the employee during preceding weeks, and determining the impact on the overtime premium that would be caused, if the correction pay is counted when calculating the overtime premium.

For example, Bakkestuen received correction checks totaling $637.92 during the week ending October 18, 2013. (PFOF ¶73) It is possible to average Bakkestuen's hours worked and total straight time pay received during weeks preceding October 18, 2013, and calculate the amount of overtime premium received if the $637.92 is counted, and not counted as straight time pay.  The difference between the two calculations is a fair estimate of overtime wages that should have been paid, resulting from the correction.

6.    <u>Plaintiffs Were Underpaid During Other Weeks</u>.

Plaintiffs are also seeking summary judgment on pay calculation errors/illegalities during the following weeks:

Winchell (Week  ending 7/5/13):  Pursuant to the agreement between Lepke and Winchell, which is fully enforceable under Wis. Stat. §109.03(1) and (5), Winchell is entitled to his regular rate for each and every hour worked (other than prevailing wage work for which he is entitled to

a higher rate of compensation); and overtime pay for each hour worked over 40, regardless of whether he is exempt from overtime pay by law.

Between June 24 and June 28, 2013, and within a single calendar week, Winchell worked a total of 56 hours for Lepke.  He was paid at his regular rate of $14 for 40 of the hours worked, but not paid at all for the other 16 hours on the pay date of July 5, 2013.  (PFOF ¶75)  Winchell is entitled to a rate equal to 1.5 times his regular rate of $14 for each of the 16 hours worked after 40 for the week, for a total of $14 * 1.5 * 16, or $336.

Winchell (Week of 7/20/13-7/26/13)  During this week Winchell worked a total of 58 hours; but was only paid for 40 of the hours at $14 per hour. (PFOF ¶76) He is entitled to additional compensation equal to $14 * 1.5 * 18, or $378.

Winchell (Week of 2/1/14-2/8/14): During this week Winchell worked 10.25 hours on a prevailing wage project on Wednesday.  (PFOF ¶77) Under Wisconsin prevailing law, overtime pay must be paid, if an employee works more than 10 hours per day on a prevailing wage project. Wis. Stat. §103.50(2); §103.49(1)(c).  The workday clearly was covered by Wisconsin rather than Minnesota prevailing wage laws, because otherwise Winchell would be entitled to overtime pay after 8 hours.[2]  A private right of action is available to collect unpaid prevailing wages on Wisconsin highway projects. *Green v. Jones*, 23 Wis. 2d 551 (1964).

On a Wisconsin highway project, overtime pay equals 1.5 times the employee's basic hourly rate of pay.  Wis. Stat. §103.50(2).  The provision wording defining the amount of overtime pay is identical to the wording of other prevailing wage statutes administered by the Wisconsin DWD.  See for example §66.0903(3)(dm).  Wisconsin prevailing wage laws permit

---

[2] See http://www.dot.state.mn.us/const/labor/overtime.html

employers to pay prevailing wage fringe benefits in cash instead.   See DWD §290.04. An employee's actual wage rate for working on a prevailing wage project therefore may be higher than the minimum wage rate required by the DWD's prevailing wage determination.  The DWD has interpreted §66.0903(3)(dm) to mean that overtime pay must equal 1.5 times the employee's regular rate of pay, if the employee's regular rate of pay is higher than the minimum required by the prevailing wage determination. See DWD Question and Answer on the Prevailing Wage, 2012, under question: "How is overtime calculated on a public works project?"[3]  The same interpretation should be given to the identically worded Wis. Stat. 103.50(2).

Winchell was paid at the rate of $42.29 for his prevailing wage work during the week ending February 7, 2014.  1.5 times the basic rate of $42.29 yields an overtime rate of $63.44, so that Winchell is owed 0.15 hours * ($63.44 - $55.34), or $2.03.  (PFOF ¶77)

Bakkestuen (Weeks of March 14 and 22nd, 2014) During the weeks of March 22, 2014 and March 14, 2014, Bakkestuen worked a total of 85 hours. (PFOF ¶78)  Lepke treated all but 26 of the hours as prevailing wage hours.  (Id.)  Included in the 59 hours of prevailing wage work is 20.5 hours of prevailing wage overtime work.  (PFOF ¶79)   Lepke in fact paid Bakkestuen only 12.15 hours of prevailing wage overtime, and at a rate of $55.34, which was less than 1.5 times his regular prevailing wage rate of $42.29. (PFOF ¶80)

During the two weeks Bakkestuen worked a total of 38.75 hours covered by the regular prevailing wage rate of $42.29, 20.25 hours covered by the overtime prevailing wage rate of $63.44 (1.5 times the $42.29), and 26 hours at his regular rate of $14 per hour, for a total of

_____

[3] Available at: https://dwd.wisconsin.gov/er/prevailing_wage_rate/publication_erd_8731_p.htm#36 How

$2,923.40.  He in fact only received regular and overtime prevailing wage pay of $2,654.98, for total damages of $268.42. (Id.)

Jensen (Week ending 8/16/13):  Jensen's time card for this week shows that he worked a total of 49 hours, with the final 7 hours on a prevailing wage project.  Lepke paid Jensen's 7 hours at a regular rather than overtime prevailing wage rate, even though the 7 hours were worked after Jensen had already worked 40 hours for the week. (PFOF ¶81) Lepke violated §103.50(2) by permitting Jensen to work on a prevailing wage project after he had already worked 40 hours for the week, without paying him at the overtime prevailing wage rate.

Lepke also paid Jensen's non-prevailing wage overtime at 1.5 times his base hourly rate of $13, rather than 1.5 times the average wage rate Jensen earned during the workweek. (PFOF ¶82) Under Wisconsin law, overtime pay must be calculated as 1.5 times the average wage rate earned by the employee during the workweek.  *Wicke v. L & C Insulation*, 2014 U.S. Dist. Lexis 89123 *36 (W.D. WI. 2014); *Kuhnert v. Advanced Laser Machining*, 2011 WI App 23 ¶14, 331 Wis. 2d 625 (Ct. App.)  The Courts' conclusion is supported by the plain language of the statute: Just like the FLSA, Wisconsin law requires calculating the overtime rate of pay using the employee's regular rate of pay.  Compare DWD §274.03 with 29 U.S.C. §207(a).  While the FLSA permits the employee to agree to accept overtime pay at 1.5 times the bona fide rate applicable to the type of work performed during overtime hours rather than 1.5 times the average wage rate earned during the workweek, see §207(g)(2), no such exemption is permitted by Wisconsin law.  Under Wisconsin law, unlike the FLSA, an employee cannot waive his right to receive overtime pay equal to 1.5 times the average wage rate earned during the workweek. Since there is no evidence Lepke agreed to a method of overtime pay different than that required

29

by law, the legal method of calculating overtime pay should be used regardless of whether the Plaintiffs are entitled to overtime pay by law, or by contract as enforceable under Wis. Stat. §109.03(1) and (5).

Actual overtime pay owed to Jensen for the week can be calculated as follows:  7 hours at 1.5 times the regular prevailing wage of $42.29 per hour, for a total of $444.08. For the 2 hours of non-prevailing wage overtime regular pay of $26 ($13 per hour times 2), and an overtime premium equal to the average wage rate earned for the workweek (42 * $13 + 7 * $42.29)/49, or $17.18 per hour, for a total of $17.18 ($17.18 * 2 hours /2), for total pay for the 9 overtime hours of $444.08 + $26 + $17.17, for a grand total of $487.25.   Adding in 40 hours of non-overtime work at $13 per hour results in weekly total pay of $1,007.25.  Taking into account the $900.53 actually paid, Jensen was underpaid by $106.72 during this week.  (PFOF ¶82)

Jensen (Week ending 8/23/13):  During this week Jensen worked on both prevailing and non-prevailing wage projects, but was paid overtime pay calculated as 1.5 times his $13 base rate, rather than 1.5 times his average wage earned during the workweek. (PFOF ¶83) Actual overtime premium owed to Jensen this week equals his average wage rate earned during the workweek (38.25 hours * $13 + 7 hours * $42.29)/45.25, or $17.53 per hour.  Overtime premium owed equal $17.53 * 5.25 hours and then divided by 2, or $46.02.  Actual overtime premium paid this week was 5.25 hours * $6.50 per hour, for a total of $34.13, for total damages of $11.89. (PFOF ¶84)

Jensen (Week ending 8/30/13)  During this week Jensen was paid for a total of 90.5 hours on his check stub, including 37 hours of correction pay. His time card for the week shows 51.5 hours worked, with the final 12 hours prevailing wage work.  (PFOF ¶85)

30

For his actual work performed during the week Jensen should have received $13 per hour for the first 39.5 hours, the regular prevailing wage rate of $42.29 for the first 0.5 hours of prevailing wage work, and 1.5 times the regular prevailing wage rate of $42.29 (or $63.44) for his final 11.5 hours of prevailing wage work; for a total of $1,257.71.

For the 37 hours of correction Jensen should receive the difference between the full prevailing wage rate of $42.29, and the $13 that he was paid on earlier paychecks, for a total difference of $29.29.[4] 37 hours at $29.29 per hour equal $1,083.73, for total wages due this week of $2,341.44.  Jensen was thus owed $172.98 this week, once actual pay of $2,168.46 is taken into account. (PFOF ¶86)

Jensen (Week ending 10/18/13):  During this week Lepke used the incorrect rate to compensate Jensen for both his daily prevailing wage overtime, and his weekly non-prevailing wage overtime.  For Jensen's half hour of prevailing wage overtime he was entitled to pay at 0.5 times the overtime rate of $63.44, or $31.72.  The average wage rate earned by Jensen during the work week equal (27.5 * 42.29 + 19.25 * 13) /46.25, or $30.56 per hour.  Overtime premium owed for the 6.75 hours of non-prevailing wage overtime therefore equals $30.56 * 6.75 /2, or $103.14.

Actual overtime premium paid to Jensen this week equal $6.50 * 6.75 hours, plus $11.66 ($53.95 - $42.29) * 0.5 hours, for a total of $49.71.  Total damages owed this week therefore equal $85.15, plus overtime impact of the $814.64 "adjustment of state", to be calculated pursuant to the method proposed in section E.  (PFOF ¶87)

---

[4] This section of the brief does not separately calculate damages owed, because Lepke failed to add the correction wages back into the week when the work was performed, to determine whether additional overtime pay was owed. See Section E for the Plaintiffs' proposed method of estimating damages for this failure.

Jensen (Week ending 11/15/13):  During this week Lepke used Jensen's regular rate, rather than the higher average wage rate earned during the workweek to calculate Jensen's overtime pay. Actual straight time pay earned this week was $16.14.  Actual overtime premium earned this week therefore equal $16.14 * 3.75 /2, or $30.26.  Compared to actual overtime premium paid of $24.38, overtime pay owed this week equal $5.88. (PFOF ¶88)

       7.     Conclusion.

      For the above stated reasons, the Plaintiffs' motion for summary judgment on liability should be granted in its entirety.

      Dated this 30th day of June, 2015.

> /s/ Yingtao Ho
> Yingtao Ho (SBN 1045418)
> THE PREVIANT LAW FIRM, S.C.
> 1555 N. RiverCenter Drive, S. 202
> Milwaukee, WI  53212
> Telephone: 414/271 4500
> Fax: 414/271 6308