UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GREG BAKKESTUEN, )<br>DAVID WINCHELL, and )<br>BRIAN JENSEN, )<br>)<br>      Plaintiffs, )<br>)<br>    v. )<br>)<br>LEPKE HOLDINGS LLC, )<br>WILLIAM LEPKE TRUCKING LLC, and )<br>WILLIAM LEPKE, )<br>)<br>      Defendants. ) | Case No. 14 CV 700 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

The defendants in the above-entitled action, having filed a Motion for Summary Judgment seeking dismissal of the plaintiffs' claims against them, herewith submit this, their Memorandum of Law in support thereof, and state to the Court as follows:

### I. STATEMENT OF THE CASE

The plaintiffs were employed as dump truck drivers for defendant Lepke Holdings LLC during 2013 and the first few months of 2014. [Second Amended Complaint ("SAC") ¶ 1, 6, 11.] Plaintiff Brian Jensen was subsequently employed in a similar capacity by defendant Bill Lepke Trucking LLC for several months in 2014. [Id.] Since the claims of the plaintiffs are essentially identical with respect to the two named corporate defendants, for clarity of discussion the corporate defendants will herein be referred to collectively as "Lepke Trucking" or "the defendants". The plaintiffs bring this action under the Fair Labor Standard Act and, more specifically, under the Minimum Hours provisions of 29 U.S.C. §207(a), which requires payment

of "time and one half" for all hours worked in excess of forty (40) during a work week. The defendants deny these allegations and assert that the plaintiffs have been fully compensated for all hours worked. [Defendants' Answer to SAC ¶ 24-26, 41-46.]

The defendants contend that the plaintiffs have failed to state a claim upon which relief may be granted because all of the plaintiffs' truck driving activities were exempt from Section 207 of the Fair Labor Standards Act under 29 U.S.C. § 213(b)(1). The plaintiffs attempt to overcome the exemption via various allegations essentially denying any facts which would give rise to a § 213(b)(1) exemption. For example, they allege that "no dump truck drivers employed by [the defendants] drove their dump trucks across state lines during the work weeks; and no dump truck drivers employed by [the defendants] drove their truck across state lines during the preceding four months . . . ." [SAC ¶ 14, denied by the defendants.] The plaintiffs also allege that all the materials the plaintiffs transported "were originally removed from locations within the State of Wisconsin." [SAC ¶ 15, denied by the defendants.]

Shortly after the First Amended Complaint was filed, on February 25, 2015, the defendants served their responses to the plaintiffs' discovery requests which, among other things conclusively refuted the above-cited allegations. In response to Interrogatory No. (4), which asked the defendants to identify all driving assignments completed by each Plaintiff which required the plaintiff to drive outside the State of Wisconsin, the defendants provided evidence of dozens of such trips made by each of the defendants. [Defendants' Responses to Plaintiffs' First Set of Discovery Requests ("Responses"), para. 4. See Westley Decl. ¶2; Exhibit J.] The defendants showed that plaintiff Jensen made trips crossing the Wisconsin-Minnesota border on at least 48 different dates between August of 2013 and June of 2014. [Responses to Interrogatory No. 4.] The defendants showed that plaintiff Winchell made trips crossing the

Wisconsin-Minnesota border on at least 26 different dates between June of 2013 and February of 2014. [Id.] The defendants also showed that plaintiff Bakkestuen made trips crossing the Wisconsin-Minnesota border on at least 51 different dates between September of 2013 and March of 2014. [Id.]

In response to Interrogatory No. (5), which asked the defendants to identify all driving assignments that were assigned to other employees of the defendants which could have been assigned to the plaintiffs, the defendants (assuming that the plaintiffs were asking about interstate trips) identified 18 dates between June of 2013 and September of 2013 on which such trips were made. [Responses to Interrogatory No. 5.] The defendants further stated in response to Interrogatory No. (5) that once they began working for Ames Construction on the I-90 bridge reconstruction project in October of 2013 the company's drivers, including both the plaintiffs and the other drivers, participated in "multiple daily crossings between Minnesota and Wisconsin involving all drivers." [Id.] They produced extensive records of such trips. [Responses, Attachment "K".]

Despite this overwhelming evidence, the plaintiffs have neither withdrawn nor revised their factually erroneous allegations regarding the interstate nature of the transportation services they performed, thus necessitating this Motion seeking dismissal of the plaintiffs' claims under the Fair Labor Standards Act. Since the complaint alleges federal jurisdiction under 28 U.S.C. §1331, and makes no claim of federal jurisdiction under 49 U.S.C. §1332, dismissal of the plaintiffs' claims under the Fair Labor Standards Act must necessarily result in dismissal of their state law claims under Chapter 109 of the Wisconsin Statutes.

## II. APPLICABLE LEGAL PRINCIPLES

The exemption which is dispositive of this action is found in 29 U.S.C. § 213(b)(1) and reads as follows:

> "**(b) Maximum hour requirements**. The provisions of section 207 of this title shall not apply with respect to
>
> > "**(1)** any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 . . . ."

49 U.S.C. §31502(b)(1) gives the Secretary of Transportation the power to prescribe requirements for "qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier . . . ." The Secretary's jurisdiction extends to transportation by motor carrier between a place in a state and a place in another state. 49 U.S.C. §13501(1)(A). A "motor carrier" is defined in 49 U.S.C. §13102(14) as "a person providing motor vehicle transportation for compensation." It is beyond dispute that Lepke Trucking provides motor vehicle transportation for compensation. [Lepke Decl. ¶ 3.]

Although it is only necessary to show that the Secretary of Transportation has power to establish maximum hours of service, the Secretary has in fact done so by enacting 49 C.F.R. Part 395. Generally speaking, 49 C.F.R. §395.3 prescribes certain limitations on driving a property-carrying commercial motor vehicle, including driving no more than eleven (11) hours during a 14-hour period following an off duty period of not less than ten (10) consecutive hours (subsection (a)), and not driving after having been on duty for more than 60 hours in seven (7) days or 70 hours in eight (8) days (subsection (c)). 49 C.F.R. §395.8 requires drivers to complete a daily record of duty status (often referred to as a "driver's log") reflecting their time spent driving as well as their time spent on other work-related activities. However, the driver log

requirements do not apply to drivers working for motor carriers such as Lepke Trucking that consistently operate within a 100 air-mile radius of the normal work reporting location. See 49 C.F.R. §395.1(e)(1).

It is thus uncontrovertible that if the Lepke Trucking drivers cross state lines they become subject to the § 213 (b)(1) exemption and thus cannot claim overtime pay under the Fair Labor Standards Act.

The § 213(b)(1) exemption was addressed by the United States Supreme Court in Morris v. McComb, 332 U.S. 422, 68 S. Ct. 131, 92 L. Ed. 44 (1947) and the Court set forth therein certain bedrock principles governing the exemption that have remained firmly fixed throughout the decades that have passed since the decision was rendered. The truck drivers in Morris were primarily engaged in local cartage operations in the Detroit, Michigan metropolitan area. More than 96% of their trips were in furtherance of intrastate commerce within the state of Michigan, primarily intraplant and interplant short-haul moves for the motor carrier's two principal customers. It appears that the vehicles never left the state of Michigan. However, the evidence showed that 3.65% of the trips involved the transportation of freight to or from interchange points in Michigan where prior or subsequent transportation across state lines took place. 332 U.S. at 433; see also footnote 7. These interstate trips "were not distributed equally to each driver nor on the basis of 4% of his time each day." Id. The Interstate Commerce Commission ("ICC")[1] had the power to regulate the maximum hours of service of such drivers but had not exercised such power. McComb, footnote 13.

---

[1] Responsibility for safety regulation of interstate motor carriers now resides in the Federal Motor Carrier Safety Administration, an agency under the control of the Secretary of Transportation.

The Court concluded that all of the motor carrier's drivers were subject to the § 213(b)(1) exemption, even the two drivers that never made any interstate trips at all:

> "The Commission has made no exception in these qualifications and maximum hours of service that would exempt the drivers of the petitioner from them as a class. The applicability of the Commission's present requirements as to specific drivers is not the issue before us. We hold that the Commission has the *power* to establish qualifications and maximum hours of service, pursuant to the provisions of §204 of the Motor Carrier Act, for the entire classification of petitioner's drivers and 'mechanics' and it is the existence of that power (rather than the precise terms of the requirements actually established by the Commission in the exercise of that power) that Congress has made the test as to whether or not §7 of the Fair Labor Standards Act is applicable to these employees." 332 U.S. at 434; emphasis in original.

In Levinson v. Spector Motor Service, 330 U.S. 649, 67 S. Ct. 931, 91 L. Ed 1158 (1947) the Supreme Court, following a detailed analysis of the ICC's exercise of its safety jurisdiction over motor carriers, stated as follows:

> "From the point of view of the Commission and its jurisdiction over safety of operation, this indicates that it is not a question of fundamental concern whether or not it is the larger or the smaller fraction of the employee's time or activities that is devoted to safety work. It is the character of the activities rather than the proportion of either the employee's time or his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." 330 U.S. at 674-675.

The Court went on to say:

> ". . . an employee who is engaged in a class of work that affects safety of operation is not necessarily engaged during every hour or every day in activities that directly affect safety of operation. While the work of a full-duty driver may affect safety of operation during only that part of the time while he is driving, yet, as a practical matter, it is essential to establish reasonable requirements with respect to his qualifications and activities **at all times** in order that the safety of operation of his truck may be protected during those particular hours or days when, in the course of his duties as its driver, he does the particular acts that directly affect the safety of its operation." 330 U.S. at 675-675, emphasis added.

The Court noted that any attempt to expand the scope of §7 of the Fair Labor Standards Act in a manner that would reduce the jurisdiction of the ICC under the Motor Carrier Act could not be permitted because the Administrator of the Department of Labor's Wage and Hour Division "has no authority to do so." 330 U.S. at 684. The Court in Morris summarized this result thusly: ". . . the possible reconciliation of the language of these Acts [the Motor Carrier Act and the Fair Labor Standards Act] so as to provide for concurrent jurisdiction was considered at length in the *Levinson* case and the conclusion was there reached that such a construction was not permissible." 332 U.S. at 437-438.

Subsequent decisions have consistently adhered to the principles set forth in Morris and in Levinson. See, for example, Shew v. Southland Corporation, 370 F. 2d 376 (5th Cir., 1966) ("[t]here is no concurrent jurisdiction between the Fair Labor Standards Act and the Motor Carrier Act . . . . Thus if Shew is a motor carrier employee under the jurisdiction of the Interstate Commerce Commission he is excluded from the benefits of the overtime provisions of the Fair Labor Standards Act," 370 F. 2d at 380); Barris v. Bozzay Roadrunner Service, Inc., 651 F. Supp. 36 (E.D. Mo., 1986) (". . . the exemption expressly applies whenever the Secretary [of Transportation] *has the power*, not solely when he or she exercises it," 651 F. Supp. at 38). See also Opelika Royal Crown Bottling Company v. Goldberg, 299 F. 2d 37, 42 (". . . the question under the section is not whether the employees are regulated, but whether the ICC has the power to regulate them . . . ." By contrast, in Spies v. Ben Hill County, 980 F. 2d 683 (11th Cir., 1993), which involved overtime claims brought by emergency medical technicians, the Court found that the Secretary of Transportation had disavowed jurisdiction over ambulance services operating in interstate commerce. The Court thus concluded that there was no overlapping jurisdiction and the § 213(b)(1) exemption did not apply. 980 F. 2d at 686.

Cases involving drivers who operated almost entirely in intrastate commerce but who occasionally did operate in interstate commerce, or who could be called upon to operate in interstate commerce, continue to follow the principles set forth in <u>Morris</u>. For example, in <u>Brennan v. Schwerman Trucking Co. of Virginia</u>, 540 F. 2d 1200 (4th Cir., 1976) the Secretary of Labor contended that the § 213(b)(1) exemption no longer applied after the motor carrier lost the business of a customer that had been the motor carrier's principal source for interstate business, resulting in the closing of the carrier's Montvale, Virginia terminal. The motor carrier's total interstate business had dropped from 9.7% in 1967 to 2.4% in 1974. The Court found that solicitation of interstate transportation business, even if unsuccessful, was sufficient to implicate the jurisdiction of the ICC. 540 F. 2d at 1203. The Court then analyzed the manner in which the small amount of interstate hauling was offered to the drivers, and determined that the loads were offered to the drivers based on location and seniority. The Court concluded that even though "few of Schwerman's drivers actually engaged in interstate cartage as a result of the manner in which individual hauls are assigned, we are nevertheless of the opinion that the reasoning of the Court in *Morris* is no less applicable to the facts presented here." 540 F. 2d at 1205.

The § 213(b)(1) exemption "is clearly applicable to drivers if their company engages in more than de minimus interstate commerce." <u>Williams v. Alex's Transportation, Inc.</u>, 969 F. Supp. 1142, 1144 (N.D. Ill., 1993), citing <u>Garcia v. Pace Suburban Bus Service</u>, 955 F. Supp. 75, 77, (N.D. Ill., 1996). In <u>Williams</u> the driver made just one out-of-state trip during his three weeks of employment. The Court stated that the driver's "interstate run to LaCrosse, Wisconsin, alone is sufficient . . . ." for purposes of the § 213(b)(1) exemption. 969 F. Supp. At 1145. The Court also noted that the motor carrier's involvement in interstate transportation was more than de minimus, noting the company's contracts with a number of railroad companies to transport

railroad crews through several states. [Id.] Finally, the Court concluded that the motor carrier "assigned drivers indiscriminately to interstate work" noting that the plaintiff did not have an assigned interstate or intrastate route and could be called upon to drive within Illinois, or to points in three other states. [Id.] See also Walters v. American Coach Lines of Miami, Inc., 569 F. Supp. 2d 1270 (S.D. Fla., 2008) (trips across state lines constituted only about 4% of defendants' total revenues).

In Vindinliev v. Carey International, Inc., 581 F. Supp. 2d 1281 (N.D. Ga., 2008) the Court enunciated a three-point test for determining whether a company's drivers qualify for the § 213(b)(1) exemption:

> ". . . the defendant must show that (a) some of its drivers were involved – by evidence of actual or solicited trips – in interstate motor vehicle transportation, (b) the involvement with interstate motor vehicle transportation was no more than four months prior to the pay period at issue ('four month rule'), and (c) the plaintiff did make, or could reasonably have been expected to make one of those interstate trips." 581 F. Supp. 2d at 1286, footnote omitted, citing Reich v. American Driver Service, 33 F. 3d 1153, 1156 (9th Cir., 1994).

The Court in Reich determined that the drivers (who transported sugar beets on a seasonal basis) did not fall under the § 213(b)(1) exemption at the beginning of the hauling season because they engaged only in intrastate operations. It was not until later in the season that the motor carrier engaged in interstate commerce. The Court concluded that the exemption did not apply "until one of [the defendant's] drivers actually engage in interstate commerce." 33 F. 3d at 1157.

The Third Circuit recently reaffirmed the time tested principles summarized above in Resch v. Krapf's Coaches, Inc., Case No. 14-3679, May 12, 2015, 785 F. 3d 869 (3rd Cir., 2015). The Plaintiffs there were Transit Division drivers who sometimes worked more than forty hours in a week without receiving overtime pay. Only 178 out of 13,956 trips made by the plaintiffs,

or 1.3%, required the drivers to cross state lines. Sixteen of the 34 plaintiffs never crossed state lines and eight of the others only did so once. Resch, page 4.

The District Court granted the defendant's Motion for Summary Judgment, holding that the drivers were ineligible for overtime pay under the § 213(b)(1) exemption and the corresponding Pennsylvania statute. The Third Circuit affirmed, noting that two conditions dictate whether the § 213(b)(1) exemption applies, namely the class of employer and the class of work the employees perform. Resch, page 7. The defendant met the "class of employer" test because it was undisputed that the employer was a "motor carrier" subject to the jurisdiction of the United States Department of Transportation.

Relying heavily on Morris v. McComb, the Court had no difficulty concluding that the defendant had easily satisfied the "class of work performed" test as well, despite the fact that many of the plaintiffs never crossed state lines and most of the rest of them rarely did. The "relevant inquiry" was "whether Plaintiffs reasonably could have expected to drive interstate . . . ." Resch, page 11. Answering this inquiry in the affirmative, the Court observed that the defendant always operated at least one interstate route per month, the drivers were trained on as many routes as possible, and the motor carrier retained discretion to assign drivers to either interstate or intrastate routes. Id.

### III. SUMMARY JUDGMENT STANDARD

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Celotex, 477 U.S. at 323. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.

## IV. ARGUMENT

Application of the above legal principles leaves no room for doubt that all of the defendants' drivers, including the plaintiffs, were at all times subject to the § 213(b)(1) exemption. As in Resch, the defendants satisfy the "class of employer" test. Both have been issued U.S.D.O.T. numbers. [Lepke Decl. ¶ 6.] Further, the drivers were all required to obtain a commercial driver's license as required by 49 C.F.R. Part 383, and were subject to the federal regulations governing drug and alcohol testing under 49 C.F.R., Parts 40 and 382. [Id.] The drivers were required to possess current medical cards as required by 49 C.F.R. § 391.43 and were subject to the federal hours of service regulations found in 49 C.F.R. Part 395.[2] [Id.]

The second issue, the "class of work performed" test, is likewise easily satisfied. The evidence shows that all the defendants' drivers, including the plaintiffs themselves, drove interstate routes on a regular basis. Defendant William B. Lepke started with one truck and was operating in interstate commerce on a regular basis even before becoming a multi-truck operation. [Lepke Decl. ¶ 8; Exhibit A.] As drivers and trucks were added to the fleet, other

---

[2] Because the defendants' operations were conducted within a 100-mile radius of the normal work reporting location, log books were not required. See 49 C.F.R. § 395.1(e).

drivers, including each of the three plaintiffs, were assigned interstate routes on a regular basis. [Lepke Decl. ¶ 8; Exhibit B.]

In November of 2013 the defendants began working for Ames Construction in connection with the I-90 bridge reconstruction project, which involved pickups from, and deliveries to, both the Minnesota side and the Wisconsin side of the project. [Lepke Decl. ¶ 10.] The vast majority of that service, which often amounted to dozens of trips per day, was performed in interstate commerce. Even the transportation of sand from Brownsville, Minnesota to the Minnesota side of the bridge, which normally would have been considered intrastate commerce within the State of Minnesota, became interstate when it became necessary for the vehicles to cross into Wisconsin to make those deliveries. [Lepke Decl. ¶ 11(a); Exhibit C.][3]

Most of the remaining services for Ames Construction were performed in interstate commerce, as evidence by the Ames Job Number entered by the drivers on the daily time records they prepared when working on Ames Construction projects. [Lepke Decl. ¶ 12.][4] All but five of the rip rap shipments from Wisconsin quarries to the Bridge Site had Minnesota Job numbers. [Lepke Decl. ¶ 11(b); Exhibit D.] The vast majority of the muck-sand round trips to and from Trempealeau, Wisconsin had Minnesota Job numbers. [Lepke Decl. ¶ 11(c); Exhibit E.] None of the "common" – sand round trips to and from Trempealeau, Wisconsin had Wisconsin Job numbers. [Lepke Decl. ¶ 11(d); Exhibit F.] A majority of the one-way sand trips from Trempealeau, Wisconsin to the Bridge Site had Minnesota Job numbers. [Lepke Decl. ¶ 11(d); Exhibit G.] None of the miscellaneous shipments had Wisconsin Job numbers. [Lepke Decl. ¶ 11(f); Exhibit H.]

---

[3] See 49 U.S.C. § 13501(1)(B), which confers jurisdiction on the Secretary of Transportation over motor carrier operations "between a place in a State and another place in the same State through another State."
[4] Copies of all records used in preparing Exhibits C through H were provided to the plaintiffs in discovery.

It is unnecessary for this Court to determine whether or not the plaintiffs could have been called upon to engage in interstate commerce, as was done in Morris, Resch and other cases, because it is beyond dispute that each of the plaintiffs did in fact perform interstate services on a recurring basis. Nor is it necessary to explore whether or not the defendants' interstate operations were confined to certain times of the year, as in Vindinliev, because the evidence is clear that interstate operations were an integral part of the business even before the Ames Construction hauling began. See Lepke Decl. ¶ 8, Exhibits A and B.

Dismissal of plaintiffs' claims under the Fair Labor Standards Act will result in certain state law claims of the plaintiffs remaining unresolved. This will require the Court to decide whether or not to exercise supplemental jurisdiction over such claims. The legal standard applicable to such a determination is found at 28 U.S.C. § 1367(c), which reads as follows:

> "(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

Under the doctrine of supplemental jurisdiction, federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away. Shanaghan v. Cahill, 58 F. 3d. 106, 109 (4th Cir., 1995). Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and consideration of judicial economy. Id. at 110. "There are *no* situations wherein a federal court *must* retain jurisdiction over a state law claim, which would not by itself support jurisdiction." Id. at 110, emphasis in original.

Federal law permits a District Court to decline to exercise supplemental jurisdiction over state law claims where it has dismissed all claims over which it has original jurisdiction. <u>Villas of Lake Jackson, Ltd. v. Leon County</u>, 906 F. Supp. 1509, 1521 (N.D. Fla., 1995), citing <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966). If federal claims are dismissed prior to trial, <u>Gibbs</u> strongly encourages or even requires dismissal of the state law claims. <u>Villas</u>, 906 F. Supp. At 1522, citing <u>L.A. Draper and Son v. Wheelabrator-Frye, Inc.</u>, 735 F. 2d 414, 427 (11th Cir., 1984.)

The power of the District Court to hear pendent state law claims is discretionary and such courts should refrain from deciding state law claims are more appropriately decided in state courts. <u>Williams v. Wilson</u>, 939 F. Supp. 543, 550 (W.D. Tex., 1995), citing <u>Guidry v. Bank of LaPlace</u>, 954 F. 2d 278, 285 (5th Cir., 1992). District Courts must decide whether to retain jurisdiction in such cases based on considerations of judicial economy, convenience, fairness and comity. 939 F. Supp. at 550, citing <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350, n.7, 108 S. Ct. 614, 619, n. 7, 98 L. Ed. 2d 720 (1988).

Where a federal claim drops out before trial, a District Court should not retain the state claims absent extraordinary circumstances. <u>Wentzka v. Gellman</u>, 991 F. 2d 423 (7th Cir., 1993). This Court has acknowledged that the decision to exercise supplemental jurisdiction over state law claims is a matter of discretion, citing <u>Gibbs</u>. <u>Wenner v. C.G. Bretting Mfg. Co., Inc.</u>, 917 F. Supp. 640, 649 (W.D. Wis., 1995). "However, in all but the rarest instance, the court is to decline to do so." 917 F. Supp. at 650, citing <u>Wentzka</u>.

There are no "extraordinary circumstances" present in the case at bar that would warrant retention of supplemental jurisdiction over these plaintiffs' state law claims if their claims under the Fair Labor Standards Act are defeated by the § 213(b)(1) exemption. Indeed the factors the

Court must consider strongly favor adjudication of the state claims in a state court. In evaluating such considerations as fairness and convenience to the parties, this Court should take into consideration the fact that any state court action would be venued in Vernon County, Wisconsin where most of the parties reside, as opposed to this Court, which is approximately 125 miles from the County seat of Vernon County. In evaluating the issue of comity, this Court should defer to the courts of Wisconsin to determine issues of state law under Chapter 109 of the Wisconsin Statutes. Finally it is apparent, from the succession of amended complaints the plaintiffs have filed, that their state law claims "substantially predominate" over the FLSA claims over which this Court would have original jurisdiction, but for the § 213(b)(1) exemption. See 28 U.S.C. § 1367(c)(2).

For the reasons stated herein, dismissal of the plaintiffs' claims under the Fair Labor Standards Act should result in dismissal of the plaintiffs' state law claims as well.

## V.  CONCLUSION

Many cases requiring interpretation of the § 213(b)(1) exemption involve complex factual issues such as whether single-state transportation is nevertheless interstate commerce based on a continuity of movement theory. This is not such a case. The drivers, including the defendants, crossed state lines on a regular basis and, for a significant portion of the time at issue here, on almost a daily basis. Nor is it necessary for this Court to delve into the intricacies of whether or not plaintiffs who never crossed state lines nevertheless could have been called upon

to do so. There are no genuine issues as to any material facts and the defendants are entitled to judgment dismissing the plaintiffs' FLSA claims as a matter of law.

Dated at Madison, Wisconsin this    1st    day of July, 2015.

                WESTLEY LAW OFFICES, S.C.

                /s/ Richard A. Westley
                Richard A. Westley, Attorney
                7633 Ganser Way, Suite 100
                Madison, Wisconsin 53719
                (608) 829-2981
                State Bar ID# 1013986